1   PACIFIC TRIAL ATTORNEYS
    A Professional Corporation
2   Scott J. Ferrell, Bar No. 202091
    sferrell@pacifictrialattorneys.com
3   4100 Newport Place Drive, Ste. 800
    Newport Beach, CA  92660
4   Tel: (949) 706-6464
    Fax: (949) 706-6469
5
    Attorneys for Plaintiff
6

7

8                   UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10

11  REBEKA RODRIGUEZ,                    Case No. 2:24-cv-08735-RGK-JC

12            Plaintiff,                 **SECOND AMENDED CLASS
                                         ACTION COMPLAINT FOR
13            v.                         VIOLATIONS OF CALIFORNIA
                                         INVASION OF PRIVACY ACT
14  AUTOTRADER.COM, INC., a Delaware     ("CIPA")**
    corporation, d/b/a
15  WWW.AUTOTRADER.COM,

16            Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

## I.    <u>INTRODUCTION</u>

Defendant has secretly deployed spyware at www.autotrader.com (the "Website") that accesses visitors' devices and installs tracking spyware prior to any efforts to obtain consent to do so, and then monitors and reports visitors' online habits *after* they leave the Website.

In addition, Defendant secretly allows third parties to intercept and monetize any search terms that unsuspecting visitors enter on the search bar at the Website.  The third parties link particular searches to specific visitors and provide that information to even more third parties for targeted advertising.  For example, after a visitor conducts a search for "depression" on Defendant's website, that individual's social media accounts can be flooded with ads for antidepressant medication, mental health counselors, and pharmacies.

Plaintiff recently visited Defendant's Website and entered confidential search terms into the search bar.  Without Plaintiff's knowledge or consent, Defendant intentionally aided various third parties to intercept the terms and link them to plaintiff in violation of California law.  In addition, without Plaintiff's knowledge or consent, Defendant secretly accessed Plaintiff's device and installed "pen register" and "trap and trace" tracking software in violation of California law.

The harm caused by these multiple intrusions is grave, as summarized by the world's leading cybersecurity firm:

> "*Data is worth money, which is a major reason that your online privacy is under threat.*
>
> *For instance, knowing your browsing habits or search history can deliver big profits to advertisers. If you've been searching for new apartments, your search history could tip an advertiser off to the fact that you're going to be moving home soon — time to start serving you ads for moving services, furniture, DIY stores, and home insurance….*

*The risks are more far-reaching than most people realize because of what might happen to your data next. The development of Big Data means that your browsing history could be analyzed to come up with conclusions that you don't want to be drawn. For example, a woman buying items such as folic acid supplements might not appreciate a marketing agency identifying her as 'pregnant' and targeting her with pregnancy products. [¶]  If she's living with mom and dad or hasn't told her partner, she might not be happy to see 'Congratulations on Your Baby!' marketing materials arrive in the mail….*

*Whenever you visit a website, data is being stored about you — possibly without your consent and even without your knowledge. You likely want to know where that data goes and how it's used, or you could decide you want to avoid it being collected altogether.*"[1]

## II.    JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction of this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because: (i) there are 100 or more Class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is at least minimal diversity because at least one Plaintiff and Defendant are citizens of different states. Specifically, if only 1,000 California consumers interreacted with the Website a single time during the Class period, statutory damages exceed $5,000,000.  Upon information and belief, many times that number of consumers have interacted with the Website during the Class period. Notably, Defendant's Notice of Removal alleges that the amount in controversy is at least $50,000,000.  (Notice of Removal ¶ 25; Doc. 1; Page ID #5.)

2.    Defendant is also subject to jurisdiction under California's "long-arm" statute found at California Code of Civil Procedure section 410.10 because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or

---

[1]  Excerpted from "***What Is Data Privacy?***", found online at https://usa.kaspersky.com/resource-center/threats/internet-and-individual-privacy-protection (last visited Apr. 18, 2024) (emphasis added).

the United States." Indeed, Plaintiff is informed and believes and thereon alleges that Defendant generates a minimum of eight percent of revenues from its Website based upon interactions with Californians (including instances in which the Website operates as a "gateway" to sales), such that the website "is the equivalent of a physical store in California." Since this case involves Defendant's activities in the forum state, California courts can "properly exercise personal jurisdiction" over the Defendant in accordance with the Court of Appeal opinion in *Thurston v. Fairfield Collectibles of Georgia*, 53 Cal. App. 5th 1231, 1235 (2020).

3.    Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

### III.    **PARTIES**

4.    Plaintiff is a resident of California. Plaintiff was in California when Defendant accessed Plaintiff's device and installed tracking code. Plaintiff is a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by California law. As an individual who advances important public interests at the risk of vile personal attacks, Plaintiff should be "praised rather than vilified." *See Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006). Indeed, the Ninth Circuit recently made exceptionally clear that it is "necessary and desirable for committed individuals to bring serial litigation" to enforce and advance consumer protection statutes, and that Courts must not make any impermissible credibility or standing inferences against them. *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

5.    Defendant is a Delaware corporation that is an online car buying and selling portal with customers throughout the state of California and this District. Defendant's Notice of Removal represents that its principal place of business is in Georgia. (Notice of Removal ¶ 17; Doc. 1; Page ID #4.)

## IV.   **FACTUAL ALLEGATIONS**

**A.    The Right to Privacy Has Always Been a Legally Protected Interest in the United States.**

6.     Since America's founding, privacy has been a legally protected interest at the local, state, and federal levels. *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1271–72 (9th Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)) ("Privacy rights have long been regarded 'as providing a basis for a lawsuit in English or American courts.'"); and *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) ("Violations of the right to privacy have long been actionable at common law.").

7.     More specifically, privacy protections against the disclosure of personal information are embedded in California statutes and at common law. *See e.g.*, *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989) ("The Ninth Circuit has  repeatedly held that privacy intrusions may constitute "concrete injury" for purposes of Article III standing); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1041–43 (9th Cir. 2017) (finding "concrete injury" where plaintiffs claimed that unsolicited telemarketing calls "invade the privacy and disturb the solitude of their recipients*"); In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589, 599 (9th Cir. 2020) (finding "concrete injury" where Facebook allegedly tracked users' "personally identifiable browsing history" on third party websites), *cert. denied*, 141 S. Ct. 1684 (2021); *Patel*, 932 F.3d at 1275 (finding "concrete injury" where plaintiffs claimed Facebook's facial-recognition technology violated users' privacy rights).

8.     In short, the privacy of personal information is—and has always been—a legally protected interest in many contexts. Thus, a defendant whose acts or practices violate consumer privacy inflicts an actionable "injury" upon an individual.

**B.    The California Invasion of Privacy Act and Pen Registers/Trap and Trace Devices**

9.     The California Legislature enacted the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 *et seq.*, to protect certain privacy rights of California

citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." (Cal. Penal Code § 630.)

10. As relevant here, section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

11. A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." (Cal. Penal Code § 638.50(b).)

12. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." (Cal. Penal Code § 638.50(b).)

13. In plain English, a "pen register" is a "device or process" that records *outgoing* information, whereas a "trap and trace device" is a "device or process" that records *incoming* information. A "pen register" and "trap and trace device" are collectively referred to herein as "Pen-Traps" or "PR/TT".

14. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of those surveillance devices consistent with changes in both federal and state law.

15. For example, with the passage of the 2001 USA PATRIOT Act, the Pen-Trap definition was expanded to include a device or process to keep up with the advancement and evolution of Internet technologies and communications. In 2015, the

California Legislature overwhelmingly adopted this updated and expanded definition without a single vote in opposition. *See* Stats. 2015, ch. 204, § 1 (A.B. 929) (eff. Jan. 1, 2016); *see also In re Order Authorizing Prospective & Continuous Release of Cell Site Location Recs.*, 31 F. Supp. 3d 889, 898 n.46 (S.D. Tex. 2014) (citing *Susan Freiwald, Uncertain Privacy: Communication Attributes After the Digital Telephony Act*, 69 S. Cal. L. Rev. 949, 982-89 (1996) (describing the evolution of PR/TT technology from mechanical device to computer system)).

16.     For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address that the email was sent to, and the subject line—because this is the user's *outgoing* information.  On the other hand, if the same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is *incoming* information that is being sent to that same user.

17.     Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies when such a reading would not conflict with the statutory scheme." *In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at \*21 (N.D. Cal. Sept. 26, 2013); *see also Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at \*1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications.").  This accords with the fact that "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, No. 15-CV-04062-LHK, 2016 WL 8200619, at \*19 (N.D. Cal. Aug. 12, 2016).

18.     Individuals may bring an action against the violator of any provision of CIPA—including section 638.51 of the Penal Code—for $5,000 per violation.  (Cal. Penal Code § 637.2(a)(1).)

19.    CIPA provides for a private right of action and imposes civil liability and statutory penalties for the installation of pen register or trap and trace device without a court order.  Cal. Penal Code § 637.2; *see also Greenley*, 684 F. Supp. 3d at 1050-51.  In *Greenley*, the federal district court denied a motion to dismiss in a materially identical case, noting the "expansive language in the California Legislature's chosen decision," *id.* at 1050, which the court held was specific as to the type of data a pen register collects – DRAS – but "vague and inclusive as to the form of the collection tool – 'a device or process.'" *Id.*  The *Greenley* court concluded that the language suggests that "courts should focus less on the form of the data collector and more on the result."  *Id.*  Having this legal framework in mind, the court applied the plain meaning to the word "process" and concluded that "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting'" is a process that falls within CIPA's "pen register" definition.  *Id.*

**C.    Website Operators Can Deploy Tracking Software to De-Anonymize Otherwise Anonymous Website Visitors and Track and Surveil Such Users.**

20.    Individuals who use devices to connect to an Internet website are typically anonymous and expect to remain anonymous.  Some rogue website operators, however, secretly attach a "tracking beacon" to visitor devices that are then used to track and surveil users.

21.    The tracking software will connect fragments of information – such as a unique IP address, user's operating system name, operating system version number, browser name, browser version number, browser language, screen resolution, geolocation data, email address, mobile ad IDs, embedded social media identities, customer and/or loyalty IDs, cookies and device signature – with connections between them. The tracking software also connects and correlates "undeclared identifiers", such as membership in an email or subscriber list, demographics, purchases/transactions, visits to online news sites, survey results, voter registration, and motor vehicle records.

22.    Using tracking software, a website owner can correlate a grouping of fragments and the connections between them to create a unique digital profile of each individual website visitor.  This process is known as "digital fingerprinting."

23.    If a website owner can link a unique digital profile created by digital fingerprinting to a particular individual, the website owner can assemble a detailed picture of a person's private life, including: the online services for which an individual has registered; personal interests based on websites visited; organizational affiliations; where the individual has been physically; a person's political and religious affiliations; individuals with whom they have leanings and with whom they associate; and where they travel, among other things.  *See* https://www.priv.gc.ca/en/opc-actions-and-decisions/research/explore-privacy-research/2013/ip_201305/ (last visited Apr. 18, 2024).

24.    Digital fingerprinting of a website's users allows the website owner or its agent to monitor user activity (such as page views, searches, or purchases), de-codes the device used by each website visitor, and enables a website to identify the location, race, age, preferences, internet browsing history, and ethnicity of each user.  This data is captured and processed for the purpose of identifying the source of electronic communications on the website for consumer identification purposes.

25.    The following graphic shows how a website deploying digital fingerprinting spyware has gathered and assimilated the digital fingerprints of a website visitor to create a unique digital identifier and link it to a previously anonymous individual named Mary Smith, thereby revealing a treasure trove of private information about Mary Smith's private life:

/ / /

/ / /

/ / /

/ / /

/ / /



26.    In the above example, identity resolution has been achieved: using spyware materially identical to the technology used by the Defendant, the website owner has gathered and assimilated sufficient digital fingerprints of an anonymous visitor to identify that visitor as Mary Smith, and now knows the following information about her:

(a) Full name *(Mary Smith)*

(b) Date of birth *(May 1, 1979)*

(c) Gender *(female)*

(d) Home address *(2345 Avenue C, Papillion Nebraska)*

(e) Marital Status and Family *(Married with two children)*

(f) E-mail address *(*Mary.Smith@gmail.com*)*

(g) Personal Cell Phone: *(111) 123-4567*

(h) Voter Registration Status *(Registered)*

(i) Interests *(Shopping, Cooking, Traveling, Reading, Science)*

(j) Employer *(Karen's Fireside, Inc.)*

(k) Title *(Vice President)*

(l) Work Hours *(Daily 9-5)*

27.    For the preceding reasons, the ability to link a unique digital profile to a specific individual using digital fingerprinting is of great monetary value.  Indeed, it has created an entire industry known as "identity resolution."  Identity resolution is generally defined as "the ability to recognize an individual person, in real-time, by connecting various identifiers from their digital interactions across devices and touchpoints."  *See* https://www.fullcontact.com/identity-resolution/ (last visited Apr. 18, 2024).

28.    One of the means by which a website owner can gather digital fingerprints as part of its identity resolution efforts is by deploying Pen-Traps spyware on its website.

29.    In lay terms, PR/TT spyware captures electronic impulses that identify the originating source of Internet communication by capturing routing, address, or signaling information.  One means of doing so is to secretly deploy tracking spyware on a website.

30.    Indeed, PR/TT spyware has caught the attention of the United States Director of National Intelligence, who recently explained that "the advancement of digital technology, including location-tracking and other features of smartphones and other electronic devices, and the advertising-based monetization models that underlie many commercial offerings available on the Internet" pose a threat to the individuals and "raises significant issues related to privacy and civil liberties."

**D.    The PR/TT Spyware Is a "Pen Register".**

31.    To make Defendant's Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Website data is stored. In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions.  *See* Figure 1.

**Figure 1:**

32.    The server's instructions include how to properly display the Website—*e.g.*, what images to load, what text should appear, or what music should display.

33.    In addition, the server's instruction cause at least one PR/TT beacon to be installed on a Website user's Internet browser.  The PR/TT beacon then causes the browser to send identifying information—including the user's IP address—to the PR/TT beacon's software provider, which is a software-as-a-service company that develops the PR/TT beacon provided to website owners like Defendant for a fee.  The PR/TT beacon's software provider uses such PR/TT beacon to receive, store, and analyze data collected from website visitors, including visitors of Defendant's Website.  The PR/TT beacon's software provider provides analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the PR/TT beacon.

34.    The IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The first two sets of numbers indicate what network the device is on (*e.g.*, 192.168), and the second two sets of numbers identify the specific device (*e.g.*, 123.132).

35.    Thus, the IP address enables a device to communicate with another device—such as a computer's browser communicating with a server—and the IP address contains the device's geographical location.

36.    Through an IP address, the device's state, city, and zip code can be determined.

37.    As alleged below, Defendant installs the PR/TT beacon on the user's browser, and such PR/TT beacon collects information—users' IP addresses—that identifies the outgoing "routing, addressing, or signaling information" of the user. Accordingly, Defendant's PR/TT beacon is a "pen register."

38.    The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends the HTTP response. This response also includes directions to install the PR/TT beacon on the user's browser. The PR/TT beacon, in turn, instructs the user's browser to send the user's IP address to the PR/TT beacon's developer.

39.    Moreover, the PR/TT beacon's developer stores a beacon or cookie with the user's IP address in the user's browser cache.  When the user subsequently visits Defendant's Website, the PR/TT beacon instructs the user's browser to send the user's IP address through the beacon or cookie.

40.    If the user clears his or her cookies, then the user wipes out the PR/TT beacon from the user's browser cache.  Accordingly, the next time the user visits Defendant's Website, the process begins over again:  (i) Defendant's server installs the PR/TT beacon on the user's browser, (ii) the PR/TT beacon instructs the browser to send to the PR/TT developer the user's IP address, (iii) the PR/TT beacon stores a beacon or cookie in the browser cache, and (iv) the PR/TT beacon's developer will continue to receive the user's IP address on subsequent visits to the Website through the cookie or beacon.

41.    In all cases, the PR/TT beacon receives a user's IP address each and every time a user interacts with the website of one of the PR/TT beacon's developer's clients, including Defendant's Website.

42.    The user's IP address is transmitted to the PR/TT beacon along with the cookie value.

43.    The PR/TT beacon is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050.

44.    Further, the PR/TT beacon is a "device" because "in order for software to work, it must be run on some kind of computing device.  It is artificial to claim that software must be viewed in isolation from the computing device on which it runs and with which it is inseparable in regard to the challenged conduct." *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 958 (N.D. Cal. 2023).

45.    Because the PR/TT beacon captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of section 638.50(b) of the California Penal Code.

**E.    Defendant Secretly Installed Tracking Software on Plaintiff's and Other Users' Browsers Without Prior Consent or a Court Order in Violation of California Law.**

46.    Defendant owns and operates the Website.

47.    When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[2]

48.    Oftentimes, third-party scripts are installed on websites "for advertising purposes." *Id.*

49.    Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete user profile over time." *Id.*

---

[2] "Third-party tracking refers to the practice in which a tracker on a website is set by a different website than the one the visitor is currently on. Third-party trackers are snippets of code that are typically installed on multiple websites. They collect and send information about a user's browsing history to other companies, often for advertising purposes. If the same third-party tracker is present on many sites, it can build a more complete user profile over time." https://piwik.pro/glossary/third-party-tracking/ (last visited Apr. 18, 2024).  "[C]ompanies may be in trouble using third-party cookies on their websites without complying with privacy laws in a specific jurisdiction…." *Id.*

50.     Defendant has incorporated the code of the PR/TT beacon into the code of its Website.  Thus, when Plaintiff visited the Website, the Website caused the PR/TT beacon to be installed on Plaintiff's and other users' browsers.

51.     As outlined above, when a user visits the Website, the Website's code—as programmed by Defendant—installs the PR/TT onto the user's browser.

52.     Upon installing the PR/TT on its Website, Defendant uses the PR/TT to collect the IP address of visitors to the Website, which is used by the PR/TT beacon's developer to provide services to Defendant and its other clients, including targeted advertisements and website analytics.  Defendant and its partners use the PR/TT beacon to "digitally fingerprint" each visitor.

53.     At no time prior to the installation and use of the PR/TT beacon on Plaintiff's and other users' browsers, or prior to the use of the PR/TT beacon, did Defendant procure Plaintiff's or other users' consent for such conduct.  Nor did Defendant obtain a court order to install or use the PR/TT beacon.  The PR/TT beacon deploys prior to any efforts to notify visitors or obtain their consent to being tracked.

54.     The specific PR/TT spyware beacons detected on Defendant's Website are identified below, which explains the details of the beacons' deployment and the breadth of the beacons' operation.  Plaintiff's investigation of the Website has determined that at least six types of PR/TT spyware are deployed by the Website, *i.e.*, Nexxen, Neustar, LiveRamp / RapLeaf, TreasureData.com, 7SeaSky.com, and ComScore – scorecardresearch.com.

**1.     Data Harvesting Without Consent**

55.     When a user visits the Website, distinct third-party tracking services are detected. These entities, recognized as prominent digital trackers, employ sophisticated methodologies to profile users. These methodologies encompass the acquisition of device IP addresses, synchronizing external identifiers, utilizing TCP/IP header-derived IP addresses, and extracting user agent and device particulars. Additionally, they engage in cookie-sharing practices during request transmissions on the Website.

56.    Plaintiff's investigation of the Website via a computer expert has determined that visitor data is harvested and shared with third-party services immediately upon webpage loading, preceding any opportunity for visitors to consent to or decline the Website's privacy policy or cookie banner.  In addition, the Website is designed so that a visitor can navigate through the various webpages of the Website without having to make any cookie-related preferences.  In other words, a visitor to the Website can read the content of various webpages without having to make any cookie-related preferences. The following analysis of specific spyware detected on the Website reflects the analysis of such computer expert as an exemplar of what occurs during a typical user visit, and is not an attempt to allege that such expert was investigating the Website during Plaintiff's visit to the Website.

**2.    Nexxen**

57.    The Nexxen platform enables businesses to identify and segment visitors for marketing campaigns by collecting and analyzing audience data.  This data can be bought or sold between companies, amplifying its reach and potential impact.



58.    When a visitor accesses a website using Nexxen, a request is sent to the Nexxen tracking URL (adnxs.com), which allows Nexxen to gather data about the user's device and location.  The X-Proxy-Origin in the response header reveals the device's IP address, which identifies the geographic region from which the request originated.  The

user IP address in the X-Proxy-Origin response header is depicted in the screenshot image below:



In addition to IP tracking, the Website enables the use of third-party tracking cookies to be stored on the visitor's browser and sent with the request. Tracking cookies stored on the browser are depicted in the screenshot image below:



### 3.    Neustar

59.    Neustar is an advertising service that website publishers use to generate revenue on their sites. Defendant has installed on its Website software created by Neustar in order to identify Website visitors (the "Neustar Software"). The Neustar Software acts via a process known as "fingerprinting." Simply put, the Neustar Software collects as much data as it can about an otherwise anonymous visitor to the Website and matches it with existing data Neustar has acquired and accumulated about hundreds of millions of Americans. Neustar describes itself as "a leader in identity resolution providing the data and technology that enable trusted connections between companies and people at the moments that matter most. Neustar offers industry-leading solutions in marketing, risk and communications that responsibly connect data on people, devices and locations,

continuously corroborated through billions of transactions." *See*
https://www.home.neustar/about-us/news-room/press-releases/2022/neustar-partners-
with-infosum-for-privacy-first-advertising-future (last visited Nov. 2024). Neustar's
Customer Experience services connect data and media across channels (online, offline,
television, etc.) to enable marketers to analyze visitor behavior to create segmented
audiences for targeted marketing campaigns. Visitor devices are fingerprinted, and
devices identified as being associated with users are tracked and unified into a single
behavioral profile. Tracking is not limited to digital interaction; physical and offline
activities are tracked and used to further build a predictive psychological profile for
visitors. In fact, Neustar boasts of these capabilities:

**Visitor Identification:**

> **Customer Experience**
>
> Neustar's Customer Experience services connect data and media across channels (online, offline, television, etc.) to enable marketers to analyze the effectiveness of their advertising activities and determine where to invest in order to generate sales more efficiently.
>
> **IDMP:** Neustar's Identity Data Management Platform (IDMP) collects, and aggregates Log Data, including Internet Log Data, Event Data, and other information that is generated when you visit the websites of our publisher, retailer, and advertiser customers or when their ads are delivered to you on a third-party website. We use Pseudonymous IDs such as DIIs, Cookies, Mobile Advertising IDs or MAIDs, Pixel Tags, Web Beacons, Statistical IDs, third-party identifiers and other Pseudonymous IDs that do not, by themselves, identify a specific individual. In addition, the IDMP offering enables customers to use their own or third-party Attribute Data to improve the accuracy and performance of our IDMP

**Household/Cross-Device Tracking:**

> **Data Onboarding:** Using a process called Cross Device Linking, we create and store linkages between and among household or individual level Pseudonymous IDs such as DIIs, Cookies, Mobile Advertising IDs or MAIDs, Pixel Tags, Web Beacons, Statistical IDs, and other third-party identifiers, including connected and addressable TV Identifiers, that do not, by themselves, identify a specific individual. We use these linkages to 'onboard' or associate customer-provided

The Neustar Software gathers device and browser information, geographic information,
referral tracking, and URL tracking by running code or "scripts" on the Website to send
user details to Neustar. The Neustar Software also requests, validates, and transmits other
identifying information, including a website visitor's phone numbers and email
addresses. The Website sends a request to the Neustar tracking pixel when Website
visitors view the webpage. The Website stores tracking cookies for Neustar on the
visitor's browser.

SECOND AMENDED COMPLAINT



| Name | Value | Domain |
|------|-------|--------|
| ab | 0001%3A3tAscqTxmkqlAZzXC10kk%2B5LN24CCTyJ | .agkn.com |
| u | C|0EAgAAAAALnNqUAAAEAADAgAsAgfomgQAB-hAAgAALQEH... | .agkn.com |

### 4.    LiveRamp / RapLeaf

60.    LiveRamp is a data onboarding platform that gathers a company's online and offline customer data, maps the data to individual customer profiles, and uploads enriched audience segments to advertising platforms. The Website sends a request to the LiveRamp tracking pixel when Website visitors view the webpage. A request is sent to rlcdn.com to identify Website visitors.



61.    The Website stores tracking cookies for LiveRamp on the visitor's browser.

| Name | Value | Domain |
|------|-------|--------|
| rlas3 | OhiELfWTEhKcqE6AjveNcKGSQQh3+UyuzHG+ER38dVo= | .rlcdn.com |
| pxrc | CJ2dgrcGEgUl6AcQABlFCOhHEAASBgjuRxDLPRlHCLbqARDjlRl... | .rlcdn.com |

### 5.    TreasureData.com

62.    TreasureData.com is a customer data platform that can capture, analyze, and transform billions of data points collected from visitors to build segmented audiences for targeted marketing campaigns. The Website tracks pages that the visitor has viewed and stores tracking cookies on the browser for future tracking.

SECOND AMENDED COMPLAINT



| Name | Value | Domain |
|------|-------|--------|
| _td_global | 2f27507e-0577-4835-800e-a43e0036d658 | .in.treasuredata.com |

### 6.   7SeaSky.com

63.    7SeaSky.com is an unknown tracker.   It is a common practice for web tracking services to obfuscate their tracking URLs.   Numerous web beacons are sent out containing large encrypted data packets and tracking cookies are stored on the visitor's browser.



| Name | Value | Domain |
|------|-------|--------|
| cg_uuid | c9746281501e2d6c32b29bf9401675d6 | obs.7seasky.com |

### 7.    ComScore – scorecardresearch.com

64.    ComScore's Proximic is a programmatic targeting suite that allows advertisers to hyper-target audiences and tracks users across desktops, mobiles, and tablets, creating user personas containing information such as demographics, interests, and content consumption habits.   A request is sent to ScoreCardResearch.com to track visitor activity on the Website. Visitors are fingerprinted, and then a tracking cookie is stored on the visitor's browser for easier identification.

SECOND AMENDED COMPLAINT

| Name | Value | Domain |
|------|-------|--------|
| UID | 177398db92c4bd3091a13a11726000488 | .scorecardresearch.com |
| XID | 177398db92c4bd3091a13a11726000488 | .scorecardresearch.com |

## F.    Defendant's Conduct Constitutes an Invasion of Plaintiff's Privacy.

65.    The collection of Plaintiff's personally identifying, non-anonymized information through Defendant's installation and use of the PR/TT beacon constitutes an invasion of privacy.

66.    As alleged herein, the PR/TT beacon is designed to analyze Website data and marketing campaigns, conduct targeted advertising, and boost Defendant's revenue, all through their surreptitious collection of user data including Plaintiff's data.

67.    Companies such as Defendant share their users' data with the PR/TT beacon's developer.  In order for such developer to perform data analysis on user data and to assist companies like Defendant to run targeted advertising campaigns, the PR/TT beacon's developer needs to collect data that identifies a particular user.  This is why the PR/TT beacon's developer collects IP addresses:  it allows the developer to segment users in order to run targeted campaigns and perform data analysis.

68.    In other words, companies like Defendant are collecting users' data and sending it to its PR/TT beacon's developer for a profit including by optimizing its marketing campaigns.

## G.    Plaintiff's PR/TT Experience

69.    Plaintiff has visited the Website within the applicable statute of limitations period via an Internet-connected computer.  In particular, Plaintiff's visit occurred in March 2024.

70.     When Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the PR/TT beacon to be installed on Plaintiff's browser.  Defendant and the PR/TT beacon's developer then used the PR/TT beacon to collect Plaintiff's IP address.    Defendant and the PR/TT beacon's developer did more than just collect Plaintiff's IP address.  Based on the existence of multiple PR/TT beacons and tracking cookies deployed on the Website, Plaintiff is informed and believes, and thereon alleges, that the PR/TT beacon will collect and track a unique IP address, the Website user's operating system name, operating system version number, browser name, browser version number, browser language, screen resolution, geolocation data, email address, mobile ad IDs, embedded social media identities, customer and/or loyalty IDs, cookies and device signature – as well as the connections between them.  Plaintiff is also informed and believes, and thereon alleges, that Defendant and the PR/TT beacon's developer engaged in the identity resolution tactics described above in order to digitally fingerprint Plaintiff and other users of the Website.

71.     Defendant and the PR/TT beacon's developer used the information collected by the PR/TT beacon to analyze Website data and marketing campaigns, conduct targeted advertising, and ultimately boost Defendant's and/or advertisers' revenue.

72.     Plaintiff did not provide Plaintiff's prior consent to Defendant to install or use the PR/TT beacon on Plaintiff's browser.

73.     Defendant did not obtain a court order before installing or using the PR/TT beacon.

74.     Plaintiff has, therefore, had Plaintiff's privacy invaded by Defendant's violations of section 638.51(a) of the California Penal Code.

75.     As explained above, Defendant knowingly and intentionally deployed PR/TT spyware to (1) decode and record the routing, addressing, and signaling information transmitted by Plaintiff's electronic device communication; and (2) capture the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the

source of a wire or electronic communication as part of its identity resolution efforts. This conduct constitutes illegal installation of PR/TT spyware in violation of California law.

76.    Defendant did not obtain Plaintiff's knowing and informed consent to the preceding acts, nor did Defendant obtain a court order authorizing it to do so.

**H.    CIPA and Search Terms**

77.    CIPA was enacted in 1967 expressly "to protect the right of privacy of the people of [California." (Cal. Penal Code § 630.)  The California Legislature was concerned about "advances in science and technology" leading to "the development of new devices and techniques for the purpose of eavesdropping upon private communications[, which] … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." (Cal. Penal Code § 630.)  The Legislature's intent stated in "broad terms" to protect the right of privacy of the people of California "appears to lie at the heart of virtually all the decisions construing [CIPA]." *Ribas v. Clark*, 38 Cal. 3d 355, 359 (1985), *quoted in Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 199 (2021).

78.    As relevant here, section 631(a) proscribes any "person" from "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable, or is being sent from, or received at any place within this state, … or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section…." (Cal. Penal Code § 631(a).)

79.    Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies when such a reading would not conflict with the statutory scheme." *In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); *see also Greenley v.*

*Kochava*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register"); *id.* at 1046 ("the right is dynamic against new threats to privacy."); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications.").  This accords with the fact that "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, No. 15-CV-04062-LHK, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

80.    Multiple federal courts including the Ninth Circuit have recognized that the unlawful collection of search terms of website users by third parties who are not the owners or operators of the website can violate section 631(a) of the California Penal Code.  *Heerde v. Learfield Communications, LLC*, - F. Supp. 3d -, No. 2:23-cv-04493-FLA-MAA, 2024 WL 3573874, at *4-*8 (C.D. Cal. July 19, 2024) (Aenlle-Rocha, J.); *R.C. v. Walgreen Co.*, - F. Supp. 3d -, 2024 WL 2263395, at *16 (C.D. Cal. May 9, 2024) (Bernal, J.) ("URLs which disclose search terms that reveal website users' 'personal interests, queries, and habits' are 'contents' of communications under CIPA") (citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 605).

81.    Federal courts have recognized that a consumer has a reasonable expectation of privacy in search terms used in search bars on websites.  *Heerde*, 2024 WL 3573874, at *10 ("Here, Plaintiffs allege plausibly a reasonable expectation of privacy in their search terms.  As pleaded, a reasonable factfinder could determine the Search Terms were sensitive and confidential because they revealed the specific content Plaintiffs consumed.") (citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 603 and *Brown v. Google LLC*, 685 F. Supp. 3d 909, 941 (N.D. Cal. 2023) ("Ninth Circuit law indicates [] users [have a reasonable expectation of privacy] over URLs that disclose either unique search terms or the particular document within a website that a person

views."); *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108-09 (9th Cir. 2014); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 605.

82.    The Ninth Circuit has recognized that the federal "Wiretap Act's legislative history evidences Congress's intent to prevent the acquisition of the contents of a message by an unauthorized third-party or 'an unseen auditor.'" *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 608.    Numerous federal court decisions construe statutory language in CIPA consistent with the Wiretap Act's construction. *Licea v. Cinmar, LLC*, 2023 WL 2415592, at *9 (C.D. Cal. Mar. 7, 2023) ("[C]ourts have looked at cases analyzing the Wiretap Act as informative of section 631(a)."); *In re Vizio, Inc., Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1228 n.9 (C.D. Cal. 2017) (Staton, J.).    "'The analysis for a violation of CIPA is the same as that under the federal Wiretap Act.'" *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) (citation omitted).    The California Supreme Court, interpreting section 631(a) of the California Penal Code, held that, "While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device." *Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985).    "As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements." *Id.* at 361 (citation omitted), *quoted in Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021). "Partly because of this factor, the [CIPA] has been read to require the assent of all parties to a communication before another may listen." *Ribas*, 38 Cal. 3d at 361.    The Legislature's express objective in enacting section 631 is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. *Id.* at 363 (citation omitted).

83.    Individuals may bring an action against the violator of any provision of CIPA—including section 631(a) of the California Penal Code—for $5,000 per violation. (Cal. Penal Code § 637.2(a)(1).)

**I.    Defendant Secretly Installed Tracking Software on Its Website, Which Allowed a Third Party Search Engine Provider to Obtain the Content of Plaintiff's Communications Intended for Defendant Only Without Prior Consent in Violation of California Law.**

84.    Defendant owns and/or operates the Website.

85.    When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[3]

86.    The Website uses a search engine developed by a third party (the "Third Party Search Engine Provider") to implement search functions (the "Search Bar"), which allows visitors to type search queries or search terms ("Search Terms") into the Search Bar to search for specific content on the Website.

87.    Search Terms are inherently private.  All search terms are personal in nature, but there is obviously heightened desire for the searches to be kept confidential when the Search Terms themselves contain private information, as plaintiff's search did.

88.    While the Search Bar appears to be under the control of the Website, and the associated searches appear to be limited to the specific site on which the search is run, the Search Bar implemented by Defendant is, in reality and without attribution, actually implementations of the Third Party Search Engine Provider's undisclosed search engine.

89.    The Website does not notify visitors that their Search Terms will be surreptitiously intercepted by Third Party Search Engine Provider's search engine when

---

[3] "Third-party tracking refers to the practice in which a tracker on a website is set by a different website than the one the visitor is currently on. Third-party trackers are snippets of code that are typically installed on multiple websites. They collect and send information about a user's browsing history to other companies, often for advertising purposes. If the same third-party tracker is present on many sites, it can build a more complete user profile over time." https://piwik.pro/glossary/third-party-tracking/ (last visited July 2024).  "[C]ompanies may be in trouble using third-party cookies on their websites without complying with privacy laws in a specific jurisdiction…." *Id.*

conducting a search on the Website. There is no notification that would let visitors know that their searches were being tracked, stored, shared, and sold.

90. The Website does not provide users with notice that – and no opportunity to consent to –sharing Search Terms with a third party. The Website does not obtain consent to share visitors' Search Terms with third parties contemporaneously with visitors' search requests. The Website does not provide users with notice that – and no opportunity to consent to – the interception of the users' Search Terms entered via the Website's Search Bar by tracking tools allowing a third party immediate access to such Search Terms.

91. Defendant did not disclose to visitors of the Website that third-parties were intercepting the Search Terms for non-search related functions such as advertising, advertising sales and bidding, marketing profiles, and demographic databases.

92. Defendant purposefully implemented and utilized the Search Bar, which discloses Search Terms to the Third Party Search Engine Provider. Defendant purposefully implemented and utilized various marketing tools to allow the Third Party Search Engine Provider to intercept and read the Search Terms.

93. The Search Bar cannot be placed on the Website without steps taken directly by or on behalf of Defendant, *i.e.*, by a website manager. The Search Bar cannot be placed on the Website without the knowledge and cooperation by Defendant, the owner of the Website. Here, the Search Bar was employed on the Website and could not have been placed there without purposeful action on the part of Defendant.

94. Defendant knew that the search engine used on the Website would feed visitors' Search Terms to the tracking tools implemented by Defendant on the Website, and that the Website did not provide notice of or obtain consent as to such practices.

95. Both Defendant and the Third Party Search Engine Provider benefit from such arrangement by gathering valuable marketing data.

96. In order for a Third Party Search Engine Provider to perform data analysis on user data and to assist companies like Defendant to run targeted advertising campaigns, the Third Party Search Engine Provider needs to collect data about the Search

Terms that Website users type in the Search Bar. Companies like Defendant are collecting users' data and sending it to its search engine software developer for a profit including by optimizing its marketing campaigns.

97.    Plaintiff is informed and believes, and thereon alleges, that the Third Party Search Engine Provider is capable of using the Search Terms for its own advertising purposes and does so to benefit its own products and services separate from the services it renders to Defendant.

98.    Users care about who has their information and have a strong interest in limiting who may or may not access their communications with websites. Sharing users' communications including Search Terms is directly contrary to the privacy interests of website users, especially where sharing their information with one party will result in a chain reaction of data sharing with third-parties, which users cannot anticipate.. Data sharing policies for a service is an important factor for individuals deciding whether to use a Search Bar on a website.

99.    Plaintiff's investigation of the Website via a computer expert has determined that a user's search terms while using the search box on the Website is harvested and shared with multiple third-party websites that track visitor activity on the Website. The following analysis of specific sharing of user searches on the Website reflects the analysis of such computer expert as an exemplar of what occurs during a typical user visit, and is not an attempt to allege that such expert was investigating the Website during Plaintiff's visit to the Website.

100.    When searching the Website, the search phrase is added to the URL. The Website then reports the URL containing the user's search term to several third-party websites that track visitor activity on the Website.

101.    A screenshot of the user search for "Cars for Sale in Los Angeles, CA" on the Website is as follows:



102. The Website then reports the URL containing the user's search term to Google Analytics.



103. The Website also reports the URL containing the user's search term to Facebook.



104. The Website also reports the URL containing the user's search term to 7SeaSky.com.



105.    The Website also reports the URL containing the user's search term to Pinterest.



106.    The Website also reports the URL containing the user's search term to ScorecardResearch.com.



107.    The Website also reports the URL containing the user's search term to Good Ad Services.

SECOND AMENDED COMPLAINT

108.   In 2024, Plaintiff visited the Website via an Internet-connected computer. The Website's search function can be used to find a variety of content.  Plaintiff utilized the Search Bar to perform a highly confidential search ("White SUV's safe for autistic 4 year old").  Defendant was the intended recipient of the Search Terms typed into the Search Bar by Plaintiff.

109.   Defendant re-routed Plaintiff's Search Terms along with those for all users of the Website, meant for Defendant, to the Third Party Search Engine Provider.

110.   During Plaintiff's visit, Plaintiff was unaware of the tracking tools intercepting confidential communications with the Website.

111.   Plaintiff reasonably believed that communications to the Website were made in confidence.

112.   During Plaintiff's visit to the Website, Plaintiff was not provided an opportunity to review or consent to sharing of Plaintiff's information with any third party, or consent to the use of tracking tools while using the Search Bar.

113.   During Plaintiff's visit to the Website, Plaintiff was not provided with any notice or given an opportunity to provide consent to the tracking tools intercepting Plaintiff's Search Terms.

114.   When Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the search bar to transmit Plaintiff's search terms to an undisclosed third party, which is the developer of the search engine that powers the search bar on the Website.

115.   At no time prior to the installation and use of the Website's search bar search engine did Defendant or the undisclosed third-party search engine provider procure Plaintiff's or other users' consent for such conduct.

116.   Plaintiff did not provide prior consent to Defendant to install a search bar that secretly transmits Plaintiff's search terms to an undisclosed third party.

117.   Defendant did not obtain Plaintiff's knowing and informed consent to the preceding acts.

SECOND AMENDED COMPLAINT

118.  Plaintiff is informed and believes, and thereon alleges that tracking tools have been deployed to analyze Website data in the form of user Search Terms and marketing campaigns, conduct targeted advertising, and ultimately boost Defendant's and/or advertisers' revenue, all through the surreptitious collection of user data including Plaintiff's data.

119.  The Third Party Search Engine Provider is capable of using the search terms user data for its own purposes including sale to marketing agencies and the improvement of its search engine software product.

120.  The collection of Plaintiff's search terms through Defendant's installation and use of the search bar on its Website constitutes an invasion of privacy.

121.  Plaintiff has been harmed by Defendant from having [his/her] Search Terms intercepted by the Third Party Search Engine Provider.

122.  Plaintiff suffered an intangible injury to Plaintiff's dignity caused by the invasion of Plaintiff's privacy attributable to Defendant's wrongdoing and the wrongdoing of the aforementioned third parties.  Plaintiff has an interest in maintaining control over Plaintiff's private and sensitive information, such as Search Terms, as well as an interest in preventing their misuse.  Plaintiff suffered the loss of the right to control information concerning Plaintiff due to Defendant's and the actions of third parties who are partners of Defendant in the wrongdoing alleged herein.  The "disclosure of private information" is an intangible harm that is "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC. v. Ramirez*, 594 U.S. 413, 425 (2021).  This is consistent with longstanding Ninth Circuit precedent recognizing that historical privacy rights " 'encompass[] the individual's control of information concerning his or her person' ... the violation of which gives rise to a concrete injury sufficient to confer standing." *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 598 (quoting *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017)).

123.  Plaintiff has, therefore, had Plaintiff's privacy invaded by Defendant's violations of section 631(a) of the California Penal Code.

## CLASS ACTION ALLEGATIONS

124.   Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

**All persons within the state of California who visited the Website within the statute of limitations period and whose rights were violated as described above.**

125.   <u>NUMEROSITY</u>: Plaintiff does not know the number of Class members but believes the number to be in the tens of thousands, at minimum. The exact identities of Class members may be ascertained by the records maintained by Defendant.

126.   <u>COMMONALITY</u>: Common questions of fact and law exist as to all Class members, and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

    a. Whether Defendant engaged in the wrongful conduct described above;

    b. Whether Defendant violated section 638.51 of the California Penal Code;

    c. Whether Defendant violated section 631(a) of the California Penal Code;

    d. Whether Defendant's PR/TT beacon constitutes either a pen register or trap-and-trace device within the meaning of section 638.51 of the California Penal Code.

127.   <u>TYPICALITY</u>: As a person located in California who visited and used the Website, who was harmed by the violations of California statutory law impairing her right to control information concerning Plaintiff, Plaintiff is asserting claims that are typical of the Class.

128.   <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained attorneys experienced in class action litigation.  All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

129.  SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient.  Even if every Class member could afford individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### CALIFORNIA INVASION OF PRIVACY ACT

### PENAL CODE SECTION 638.51(a)

130.  Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

131.  Plaintiff brings this cause of action individually against Defendant.

132.  Section 638.51 of the Penal Code provides that it is illegal for any "person" to "install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53." (Cal. Penal Code § 638.51(a).)

133.  A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." (Cal. Penal Code § 638.50(b).)

134.  The PR/TT beacon is a "pen register" because it is a "device or process" that "capture[d]" the "routing, addressing, or signaling information"—the IP address—from the electronic communications transmitted by Plaintiff's computer or smartphone.  (Cal. Penal Code § 638.50(b).)

135.  At all relevant times, Defendant knowingly installed the PR/TT beacon—which is a pen register—on Plaintiff's browser, and used the PR/TT beacon to collect Plaintiff's IP address, and track Plaintiff.

136.  The PR/TT beacon does not collect the content of Plaintiff's electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th

Cir. 2014) ("IP addresses 'constitute addressing information and do not necessarily reveal any more about the underlying contents of communication than do phone numbers.'") (quotation omitted).

137.   Plaintiff did not provide Plaintiff's prior consent to Defendant's installation or use of the PR/TT beacon.

138.   Defendant did not obtain a court order to install or use the PR/TT beacon.

139.   Pursuant to section 637.2 of the California Penal Code, Plaintiff has been injured by Defendant's violation of section 638.51(a) of the California Penal Code, and seeks statutory damages of $5,000 for Defendant's violation of section 638.51(a).  *See* Penal Code § 637.2(a)(1).

140.   By knowingly violating a criminal statute and accessing Plaintiff's browser to install tracking software without Plaintiff's prior consent, Defendant acted with oppression and malice.  As such, Defendant is liable for punitive damages pursuant to Civil Code section 3294.

## SECOND CAUSE OF ACTION

## CALIFORNIA INVASION OF PRIVACY ACT

## PENAL CODE SECTION 631(a)

141.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

142.   Plaintiff brings this cause of action individually against Defendant.

143.   The Website, including the tracking tools placed upon them, are "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.  *See In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 937 (N.D. Cal. 2015) (stating that "***it is undeniable that a computer may qualify as a 'machine***'" within the meaning of section 631(a)) (emphasis added), *aff'd in part and rev'd in part on other grounds*, 956 F.3d 589 (9th Cir. 2020).

SECOND AMENDED COMPLAINT

144.   Within the applicable statute of limitations, Plaintiff used the search function, which is the Search Bar, on the Website to communicate Search Terms to Defendant, with the expectation of receiving search results provided by Defendant.

145.   Within the applicable statute of limitations, one or more third parties other than Defendant, without the consent of all parties to the communication, and in an unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California.

146.   The information collected by the third party or third parties was not for the sole benefit of Defendant.

147.   Within the applicable statute of limitations, Defendant aided, agreed with, employed, and conspired with such third party or third parties to implement the tracking tools, to violate section 631(a) of the California Penal Code, and to accomplish the wrongful conduct alleged herein.

148.   Plaintiff did not authorize or consent to the tracking, interception, and collection of any of Plaintiff's electronic communications.

149.   The violation of section 631(a) of the California Penal Code constitutes an invasion of privacy.

150.   Pursuant to section 637.2 of the California Penal Code, Plaintiff has been injured by Defendant's violation of section 631(a) of the California Penal Code, and seeks statutory damages of $5,000 for Defendant's violation of section 631(a).  *See* Cal. Penal Code § 637.2(a)(1).

151.   By knowingly violating a criminal statute without Plaintiff's prior consent and by failing to remediate the violation upon notification of such violation by Plaintiff, Defendant acted intentionally with oppression and malice.  As such, Defendant is liable for punitive damages pursuant to Civil Code section 3294.

/ / /

SECOND AMENDED COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

a.    An order enjoining Defendant from continuing to violate California statutory law as challenged herein;

b.    For statutory damages, punitive damages, reasonable attorneys' fees pursuant to Cal. Civ. Proc. Code § 1021.5, and costs of suit; and

c.    For any and all other relief at law or equity that may be appropriate and necessary.

Dated:  January 23, 2025                    PACIFIC TRIAL ATTORNEYS, APC


                                            By: */s/ Scott J. Ferrell*
                                            Scott. J. Ferrell
                                            Attorneys for Plaintiff

SECOND AMENDED COMPLAINT